

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 14, 2019

**BY ECF AND EMAIL**

The Honorable Nelson S. Román
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

      Re:    ***United States v. Paul Rosenfeld**, 19 Cr. 69 (NSR)*

Dear Judge Román:

      The Government respectfully submits this letter in advance of sentencing in this matter, which is set for May 17, 2019. In the final Presentence Investigation Report ("PSR"), dated May 8, 2019, the Probation Office calculated the applicable United States Sentencing Guidelines ("U.S.S.G" or the "Guidelines") range to be 24 to 30 months' imprisonment (the "Guidelines Range"). Over a period of months, the defendant built a high-powered bomb in his basement, with the expressed intent to detonate it in a public setting to make a political statement. He took steps to avoid law enforcement detection and seemed indifferent to the risks his construction of a potent destructive device posed to those around him. For the reasons set forth below, the Government submits that his dangerous conduct warrants a sentence within the Guidelines Range.

## I.      Offense Conduct

      Between August and September 2018, Paul Rosenfeld, the defendant, sent another person several letters and text messages. (PSR ¶ 9). In these messages, Rosenfeld stated that he intended to build an explosive device, transport the device to Washington D.C., and then detonate the device on the National Mall on Election Day, November 6, 2018. (PSR ¶ 10).

      On October 9, 2018, law enforcement officers stopped Rosenfeld and interviewed him. (PSR ¶ 11). During this interview, Rosenfeld admitted that he had ordered large quantities of explosive "black powder" over the Internet—which was delivered to a post office box in New Jersey—and that he had transported this black powder to his residence in Tappan, New York. (*Id.*). Rosenfeld stated that he had constructed smaller explosive devices in order to conduct test detonations, and that he had used approximately eight pounds of black powder to construct a large explosive device in his basement. (*Id.*). Finally, Rosenfeld admitted that he intended to transport this device to Washington D.C., and to detonate it on the National Mall on Election Day. (*Id.*). Rosenfeld explained that his purpose for detonating the explosive device was to draw attention to his political belief in "sortition." (*Id.*).

After law enforcement arrested Rosenfeld, agents searched Rosenfeld's home pursuant to a warrant. (PSR ¶¶ 12, 13.)  In the basement, law enforcement agents found a functional explosive device weighing approximately 200 pounds (the "Bomb").  (PSR ¶ 14.)  As shown below, the Bomb consisted of a wooden box attached to a cart with wheels.  Later analysis of the Bomb concluded that the sideboards were approximately 1.5 inches thick and attached to each other using five bolts at each corner, and that there were also metal rods and handles attached.



Federal Bureau of Investigation ("FBI") experts X-rayed the Bomb and determined that engaging the firing switch on the Bomb would generate an electrical charge, which would in turn spark electric matches inside the Bomb and ignite the black powder loaded inside.  (PSR ¶ 15.) On October 10, 2018, FBI bomb technicians removed the Bomb from Rosenfeld's home and transported it to a safe location in Rockland County.  (PSR ¶ 16.)

Later, the investigating agents sent the Bomb to the FBI laboratory to be analyzed.  The resulting expert report was provided to defense counsel and the probation office.  The report explained that, as shown below, the black powder in the Bomb was placed on a foam tray with cheesecloth on top in order to maintain uniform distribution of the explosive material.



The defendant then placed, on top of the cheesecloth that covered the black powder, approximately 70 pounds of sawdust.  According to the expert report, sawdust is used in explosive mixtures as a fuel in order to enhance the device's explosive effects.

A trigger was also recovered with the Bomb —here, the defendant modified an aerosol spray to serve as the trigger (shown below).  The can was wired so that when the trigger was pulled, the switch would be in the open position—then, when the trigger was released, the switch would close and detonate the Bomb.  This type of switch is commonly known as a dead man's switch, since, if the person holding the trigger is incapacitated or killed, he or she will release the trigger and detonate the Bomb.



The Bomb also featured two electric matches, which would have initiated the explosive reaction.  An electric match is a wire coated with pyrotechnic materials.  When an electric current passes through the wire, the pyrotechnic ignites.  The electric matches pictured below were removed from within the main explosive charge in the Bomb—*i.e.*, the black powder.



In sum, the defendant designed the Bomb so that the black powder, which was evenly distributed through the Bomb, could be ignited using the electric matches connected to the switch. The black powder would then ignite the sawdust, and the gases produced by the resulting fire would become trapped inside the Bomb. These gases would quickly build up and cause the Bomb to explode. According to the laboratory experts, the resulting explosion would have resulted in fragments of wood and metal being propelled outward at high velocities. Accordingly, the experts concluded that the Bomb was capable of causing property damage, personal injury, and death.

## II.    The Defendant's Plea and Applicable Guidelines Range

On February 14, 2019, the defendant pleaded guilty to Counts One and Two of the Information, 19 Cr. 69 (NSR). Count One charges the defendant with manufacturing a destructive device, in violation of 26 U.S.C. §§ 5822, 5861(f), and 5871. Count Two charges the defendant with transporting explosive powder from New Jersey to New York, in violation of 18 U.S.C. § 844(d).

As set forth in the plea agreement and PSR, the defendant's base offense level is 18, pursuant to U.S.S.G. § 2K2.1(a)(5). (PSR ¶ 25). Because the offense involved a destructive device, two levels are added under U.S.S.G. § 2K2.1(b)(3)(B). (PSR ¶ 26). Because the defendant demonstrated acceptance of responsibility, a three-level reduction is warranted pursuant to U.S.S.G. § 3E1.1(a) and (b). (PSR ¶¶ 32-33). Accordingly, the defendant's applicable offense level is 17. Because the defendant is within Criminal History Category I, the defendant's Guidelines range is 24 to 30 months' imprisonment.

On March 9, 2019, the defendant submitted a sentencing letter in which he requested a sentence of time served (approximately seven months' imprisonment). (Def. Ltr 1). The Probation Office recommended a below-Guidelines sentence of 18 months' imprisonment and two years' supervised release. (PSR at 24-26).

## III.    Discussion

The Guidelines, while no longer mandatory, still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that range "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). Although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46. To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

The Government respectfully submits that a sentence within the Guidelines Range is appropriate to reflect the seriousness of the offense and to promote respect for the law, afford adequate deterrence, and protect the public from further crimes from the defendant.  *See* 18 U.S.C. § 3553(a)(2)(A)-(C).

The Government readily acknowledges that the defendant's crime was anomalous—it appears the defendant otherwise led a law-abiding life.  But this offense was extremely serious. The defendant, over a period of several months, constructed an elaborate bomb in his basement. He built a large wooden box with metal bolts, metal rods, and two large wheels for transportation. He then placed eight pounds of explosive black powder on a foam tray with cheesecloth on top (to maintain uniform distribution of the explosives), then added 70 pounds of sawdust to act as an accelerant.  The defendant wired a switch and placed two electronic matches into the black powder. This was not a hoax or a sting—the defendant, on his own initiative, carefully and painstakingly built an actual bomb, which the FBI's explosives experts concluded was capable of causing property damage, personal injury, and death.

The care the defendant took to build the bomb reflects substantial planning and premeditation.  And the fact that the defendant placed the Bomb on wheels shows that the defendant was serious about transporting the Bomb to the National Mall.  Significantly, the defendant also took steps to prevent intervention by law enforcement.  For instance, the defendant purchased the black powder over the Internet and had these explosives delivered to a post office box in New Jersey rather than to his home in New York.  The defendant did not want to be arrested before he had a chance to make his political statement by detonating the Bomb on Election Day.

The fact that the defendant took these steps to promote a political ideology—sortition—is significant.  The defendant was so fanatical about his political beliefs that he was willing to build and detonate a bomb in an extremely public place.  His commitment to sortition was so extreme, he was willing to kill himself, destroy property, and risk the lives of others.  While there is no evidence the defendant affirmatively wanted to kill other people, it is hard to think of something more reckless than detonating a large bomb in a public place.  Once a bomb explodes, it is impossible to control where the fragments of wood and metal will fly.

Of course, the defendant's conduct also posed a threat well before his planned detonation. His amateur construction of a high-powered explosive at his home posed an immediate risk to his family and neighbors, as did his transportation of explosive powder across state lines.  (*See, e.g.*, PSR at 26 (citing the "reckless, dangerous nature" of the defendant's conduct)).  These dangers persisted over months until the FBI mitigated them by arresting the defendant and meticulously disarming the Bomb.

The defendant's criminal plot was serious, and the sentence imposed should reflect that.

A sentence within the Guidelines Range will also afford adequate deterrence to the defendant and others, and protect the public from future crimes by the defendant.  The defendant asks for a sentence of time served, but that is wholly inadequate for these purposes.  A substantial prison sentence is required to make clear to the defendant and others that preparing for an act of

domestic terrorism by building and planning to detonate a bomb to promote a political ideology will lead to serious punishment.  Moreover, while the defendant purportedly no longer believes "that his dramatic act, if carried out, might have precipitated a change in the electoral system," only seven months ago, the defendant was committed to protesting democratic elections by setting off a bomb.  Adequate deterrence and protection of the public require that the defendant receive a more substantial sentence of incarceration.

Finally, the defense submission makes much of the defendant's mental health, and claims that his actions were only a product of a mental breakdown.  *See, e.g.*, Def. Ltr. at 1 (stating that the defendant's offense "is the result of mental illness"); *id.* at 3 ("Inwardly, Mr. Rosenfeld has struggled for many years with depression, low self-esteem, and social anxiety.") (internal quotation marks and citation omitted).  However, at the time of his crimes, the defendant had never been diagnosed with any mental illness, and it is not clear on this record that his crimes were actually driven by mental illness.  Rather, it appears that the defendant felt aggrieved that the public was ignoring his political ideas about sortition.  So, to promote those ideas, the defendant constructed a sophisticated, powerful explosive device, took steps to avoid law enforcement scrutiny, and formed a plan to transport and detonate his Bomb on the National Mall.  For this very serious, dangerous, and premeditated conduct, a sentence within the Guidelines Range of 24 to 30 months is warranted.

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Guidelines Range of 24 to 30 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:  _____
Michael K. Krouse
Assistant United States Attorney
(212) 637-2279

Cc:  Clay H. Kaminsky, Esq. (by ECF)